AO 106 (Rev 04/10) Application for a Search Warrant

DT

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

A Black LG cellphone under ATF property number 773040-21-0105-4 and a silver LG cellphone under ATF property number 773040-21-0105-5 currently located at the ATF Columbus Evidence Vault.

Case No. 2:21-mj-516

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A INCORPORATED HEREIN BY REFERENCE

located in the Southern District of Ohio, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B INCORPORATED HEREIN BY REFERENCE

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sec. 841 | possession with intent to distribute controlled substances |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: ___) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Samuel Chappell, TFO ATF
*Printed name and title*

Sworn to before me and signed in my presence. VIA FACETIME

Date: 8-2-21

*Judge's signature*

Elizabeth Preston Deavers, U.S. Magistrate Judge
, U.S. Magistrate Judge
*Printed name and title*

City and state: Columbus, Ohio

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF TWO LG CELLPHONES, CURRENTLY LOCATED AT THE ATF COLUMBUS EVIDENCE VAULT. | Case No. 2:21-mj-516 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Samuel Chappell, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Columbus, Ohio Police Officer with the Columbus Division of Police (CPD), currently assigned as a Task Force Officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). CPD has employed me since 2007. My responsibilities as a TFO include the investigation of violent criminal street gangs, narcotics traffickers, money launderers, and firearm related crimes. I have participated in the execution of search warrants and arrests related to the above-referenced offenses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

3. Black LG cellphone under ATF property number 773040-21-0105-4 assigned IMEI number 352411-43-193709-6 and a silver LG cellphone under ATF property number 773040-21-0105-5 assigned IMEI number 354855114383507 hereinafter the "Devices." The Devices are currently located at the ATF Columbus Evidence Vault.

4. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

5. This affidavit is submitted for the limited purpose of establishing probable cause and therefore contains only a summary of the relevant facts. I have not included each and every fact that I, or others, have learned during the course of this investigation. The information set forth in this affidavit is based on my own participation in the investigation, information I have received from other law enforcement officials, and from other agents' analysis of documents and records relating to this investigation. As one of the case agents on this investigation, I am familiar with the investigative efforts of other agents and Columbus Police Detectives who have worked on this investigation. Further, I am familiar with the evidence gathered through the issuance of search warrants, subpoenas, and information provided to myself and other agents by cooperating individuals and informants.

6. The United States, including the ATF, is conducting a criminal investigation of John MYLES for violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance).

2

7. On or about November 24, 2020, TFO Burke with the Ohio Valley Drug Task Force (OVDTF) met with a Confidential Informant (CI). The CI stated that the CI knows an individual called "6-8" who sells narcotics on the south side of Columbus, Ohio. The CI reported having obtained 10-15 grams of fentanyl from "6-8" on three occasions during the summer / fall of 2020.

8. On or about March 15, 2021, the CI identified the address of 1460 Berkeley Rd., Columbus, Ohio as the address from which the CI had obtained fentanyl from "6-8." Investigators from the OVDTF contacted investigators in Columbus, Ohio, who were able to determine that "6-8" was John MYLES. One of the ways investigators linked MYLES to the name "6-8" was MYLES's listed height of 6 feet 8 inches.

9. MYLES has a prior conviction in the United States District Court for the Southern District of Ohio (Dayton) for intent to distribute more than 50 grams of cocaine base, in case number 3:06-cr-00187. MYLES was sentenced to 120 months of incarceration.

10. On or about March 24, 2021, while being monitored by investigators, the CI contacted MYLES at (937) 856-4952 to arrange a controlled buy of fentanyl. During the call the CI arranged to purchase $2,500 worth of fentanyl. The CI advised that the CI would receive approximately 30 grams of fentanyl. Several calls were made to MYLES to arrange the meeting location and to check on when MYLES would arrive. After the deal was set, investigators observed MYLES arrive at the set location. The CI met with MYLES and purchased approximately 26 grams of a mixture that later tested positive for fentanyl and heroin. The narcotics transaction was audio and video recorded.

11. On or about April 14, 2021, a second narcotics purchase was arranged with MYLES. After several calls between the CI and MYLES using the Target Cell Phone, a deal was

made to purchase narcotics at a location in Columbus. Investigators dropped the CI at the target location and observed MYLES enter the location. The CI returned from the location and stated that he had purchased approximately 3 ounces of methamphetamine from MYLES. MYLES had also given the CI approximately 4 grams of fentanyl to make up for the prior deal on March 24, 2021 being short fentanyl. The deal was audio and video recorded.

12. An examination by the Columbus Division of Police showed the narcotics purchased from MYLES on or about April 14, 2021 were 84.8 grams of methamphetamine and 4.9 grams of fentanyl.

13. Investigators conducted surveillance of MYLES after he left the buy location. MYLES was followed to 134 Parklawn Blvd., where he was observed entering the residence.

14. On or about May 26, 2021, a federal search warrant was signed authorizing investigators to track the location of a phone used by MYLES, then assigned phone number (937) 856-4952. Location data collected from June 1, 2021 to June 25, 2021, shows that MYLES's phone was at or near the 134 Parklawn Blvd. several hundred times. Prior communication with the CI and MYLES had all occurred using assigned phone number (937) 856-4952.

15. On or about June 14, 2021, the CI arranged to purchase 2 ounces of methamphetamine from MYLES on June 16, 2021. The CI called the number for which investigators had previously executed a search warrant, specifically regarding location data.

16. On or about June 16, 2021, the CI received a call from MYLES asking to meet at the Platform Lounge located at 1058 Country Club Rd., Columbus, Ohio. The CI then received a call changing the location to the Level Bar located at 1381 S. Hamilton Rd., Columbus, Ohio

4

43227. This call from MYLES came from (937) 893-3799. Later MYLES told the CI that he was having trouble with his other phone, which phone was the target of the prior search warrant.

17. Due to the Level Bar being closed, the deal was moved to Bon Aire Restaurant, located at 1435 S. Hamilton Rd., Columbus, Ohio 43227.

18. Investigators conducting surveillance on or about June 16, 2021 observed MYLES leave the 134 Parklawn Blvd. with an unknown male. MYLES entered a black GMC SUV that was followed by a white Cadillac. Both vehicles entered the parking lot of the Level Bar. MYLES and the unknown male exited the vehicle, entered the bar, and then returned to the GMC SUV a short time later. They drove to the Bon Aire parking lot, and MYLES and the unknown male entered Bon Aire.

19. Investigators received a message from the CI stating that he observed that MYLES had brought $4,500 worth of fentanyl instead of methamphetamine. The CI later stated that after telling MYLES of the mistake, MYLES and the unknown male began to argue. MYLES made a phone call and told the CI the methamphetamine would be there shortly. MYLES exited the bar and entered a silver BMW SUV. MYLES entered the backseat and exited a short time later.

20. MYLES entered Bon Aire. A short time later the CI exited Bon Aire. The CI was picked up by investigators. The CI provided investigators approximately 57 grams of suspected methamphetamine, which the CI had purchased from MYLES.

21. On or about July 8, 2021 members of the ATF Columbus Field Office arrested MYLES on an outstanding federal arrest warrant at 7 Limited Pkwy Reynoldsburg Ohio 43068. In MYLES's possession at the time was a silver LG cellphone. MYLES signed a consent to

5

search the vehicle MYLES had driven to 7 Limited Pkwy. Inside of the vehicle investigators found a black LG cellphone.

22. Prior to the arrest of MYLES investigators had executed a search warrant for the location of the phone assigned phone number (937) 856-4952. Before and during the arrest of MYLES the location data for the phone number (937) 856-4952 showed that it was located in the area of 7 Limited Pkwy.

23. On or about July 26, 2021 Investigators called (937) 893-3799. The black LG phone rang. Investigators then called (937) 856-4952 and received a message "the person you are calling cannot receive calls at this time".

24. The Devices are currently in the lawful possession of the ATF. They came into the ATF's possession in the following way: as to the silver LG cell phone, during the lawful arrest of MYLES; and as to the black LG cell phone, during a consensual search of MYLES's vehicle. Therefore, while the ATF might already have all necessary authority to examine the Devices, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

25. The Devices are currently in storage at ATF Columbus Evidence Vault. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the ATF.

26. Through my training and experience, I am aware that it is common for narcotics traffickers to use cell phones, often as a vital part of their business. Narcotics traffickers commonly use cell phones to communicate with and store contact information related to both

6

customers and suppliers. Narcotics traffickers frequently use cell phones to communicate with customers and suppliers via SMS or text message, voice calls, video calls, and social media. Narcotics traffickers often use cell phones to take photographs or videos of themselves, their associates, their property, and their products, including illegal narcotics. Further, it is common for narcotics traffickers to keep multiple cell phones. Narcotics traffickers keep multiple cell phones for a variety of reasons, including keeping customers on a separate number from suppliers and friends; avoiding or evading law enforcement detection; having a cheap, disposable phone for drug calls that can be destroyed if the phone is believed to have been compromised. Often narcotics traffickers do not register the cell phones they use in their business under their own names.

## TECHNICAL TERMS

27. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and

7

storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio

a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets

9

typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.lg.com/us/cell-phones, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and

PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

30. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

11

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

33. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Samuel Chappell
Task Force Officer
ATF

Subscribed and sworn to before me
on August 2, 2021.

UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

Black LG cellphone under ATF property number 773040-21-0105-4 assigned IMEI number 352411-43-193709-6 and a silver LG cellphone under ATF property number 773040-21-0105-5 assigned IMEI number 354855114383507 hereinafter the "Devices." The Devices are currently located at the ATF Columbus Evidence Vault.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1. All records on the Devices described in Attachment A that relate to violations of 21 U.S.C. Section 841 and involve John MYLES including:

   a. lists of customers and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   d. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.